IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    vs.<br><br>JOSEPH B. LEVERING,<br><br>                Defendant. | **8:20CR243**<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on Defendant's Motion to Suppress (Filing No. 16). An evidentiary hearing was held on November 13, 2020 a transcript was prepared and the matter is now ripe for disposition. For the reasons explained below, the undersigned will recommend that the motion be denied.

**FACTS**

Officer Joseph Littlegeorge ("Officer Littlegeorge") testified at the evidentiary hearing on this matter. Officer Littlegeorge is currently employed as the director of domestic violence for the Winnebago Tribe. (TR. 8.) At the time of the incident underlying this motion, Officer Littlegeorge was a tribal police officer for the Winnebago Tribe. (TR. 8.) Officer Littlegeorge testified that as an officer for the Winnebago Tribe, his duties included upholding the Winnebago Tribal criminal code, traffic code, and responding to calls of service. (TR. 8.)

Officer Benjamin Lewis StCyr ("Officer StCyr") also testified at the evidentiary hearing. Officer StCyr is employed with the Winnebago Tribe of Nebraska Wildlife and Parks Program. (TR. 25.) Officer StCyr testified that part of his job duties involves working with Winnebago police. (TR. 25.) Officer StCyr explained that because the police department was short on staff due to the coronavirus he and another conservation officer were sent to work with the tribal police officers. (TR. 25.) Officer StCyr is deputized by the tribe to enforce criminal law. (TR. 25-26.)

On September 16, 2020, Officer Littlegeorge was in the police station when he was dispatched to a residence in Winnebago, Nebraska on a simple assault call. (TR. 8; TR. 16.) Officer Littlegeorge testified he is unsure of the exact address of the residence but stated it was the

Levering residence trailer on top of the hill on D Avenue in Winnebago. (TR. 8-9.) Officer Littlegeorge stated that when he was dispatched, he was driving a marked patrol car and did not activate his emergency lights on his way to the residence. (TR. 16.)

Officer Littlegeorge testified that when he arrived at the residence, he observed a female, later identified as Rebecca Rave ("Rave"), waving her hands at him. (TR. 9.) Officer Littlegeorge testified that when he got out of his patrol vehicle, Rave told him that an individual was in the back of the residence. (TR. 9.) Officer Littlegeorge went to the back of the residence and observed another woman yelling at him to go get the individual. (TR. 9.) Officer Littlegeorge testified that as he approached the top of a hill, he saw a male, who was later identified as Defendant, jogging down the hill approximately 100-150 yards away. (TR. 9; TR. 17-18.) Officer Littlegeorge testified that he did not make any effort to stop Defendant at that time. (TR. 17.)

Officer Littlegeorge testified that he then radioed Officer StCyr. (TR. 10.) Officer Littlegeorge testified that he called Officer StCyr to have him stop and talk to Defendant to find out what was going on. (TR. 10; TR. 17-18.) Officer StCyr testified that when Officer Littlegeorge radioed him, he did not identify Defendant or provide a physical description. (TR. 27.) Officer StCyr stated that Officer Littlegeorge just provided a location at that point. (TR. 27.) Officer Littlegeorge told Officer StCyr that Defendant was heading down the hill toward the valley. (TR. 10; TR. 26.)

Officer Littlegeorge stated that at the time he called, Officer StCyr was turning off D Avenue. (TR. 10.) Officer Littlegeorge testified that Officer StCyr was about 200-250 yards off D Avenue coming down an access road. (TR. 18.) Officer Littlegeorge testified that the access road fished down towards Defendant to the top of the valley, so it was like a big bowl where Officer StCyr was driving into. (TR. 18.) Officer Littlegeorge testified that StCyr was driving a Bureau of Indian Affairs marked vehicle and did not have the siren or emergency lights activated. (TR. 18.)

Officer Littlegeorge testified that when he first called Officer StCyr, Defendant was seated in a field towards the bottom of the hill, but that Defendant started walking back down towards the valley when Officer StCyr arrived. (TR. 20.) Officer StCyr testified that when he reached

2

Defendant, Defendant walked up to his patrol unit and sat on the ground. (TR. 26.) Officer StCyr testified he did not instruct Defendant to do anything at that time. (TR. 28.) Officer Littlegeorge testified that he stood on top of the hill until Officer StCyr made contact with Defendant. (TR. 9.) Officer Littlegeorge testified that the last visible thing he saw was Officer StCyr pull-up on the pavement and Defendant head towards him. (TR. 20.)

Officer StCyr testified that after he got out of his patrol vehicle, he asked Defendant where he was coming from. (TR. 28.) Officer StCyr testified that Defendant told him he was coming from the Levering trailer and was headed to an uncle's house. (TR. 28.) Officer StCyr testified that he knew Defendant because they are cousins. (TR. 28.) Officer StCyr stated he was not asking Defendant questions at that point and was just letting Defendant talk. (TR. 29.) Defendant then proceeded to tell Officer StCyr that he had been sleeping and his mom came into his room and started hitting him and asking for money. (TR. 29.) Officer SyCyr testified that at that point, Defendant was just providing him information. (TR. 29.) Officer StCyr stated that he does not recall asking Defendant additional questions at that time but told dispatch who he was speaking to. (TR. 29.) Officer StCyr stated his plan at that point was just to wait with Defendant for Officer Littlegeorge to arrive because he was just there in a supporting role to make sure Officer Littlegeorge could make contact with Defendant. (TR. 30.) Officer StCyr testified that he thinks he told Defendant that he was waiting for Officer Littlegeorge to come to the area. (TR. 30.)

Officer StCyr testified that before Officer Littlegeorge got to the area, he asked Defendant if he had been drinking because he could smell alcohol. (TR. 29.) Defendant responded that he had. (TR. 37.) Officer StCyr testified he gave Defendant a preliminary breath test after he learned he was on federal probation and could smell alcohol. (TR. 31.) Officer StCyr testified that he gave Defendant a breath test before Officer Littlegeorge got to their location. (TR. 32.)

Officer StCyr testified that Officer Littlegeorge arrived in his patrol car approximately ten minutes after he got there. (TR. 30.) Officer StCyr testified that Defendant did not attempt to leave when Officer Littlegeorge got there. (TR. 31.) Officer StCyr testified that Defendant was not free to leave until he knew what Defendant was up to. (TR. 36.) Officer StCyr testified that Officer Littlegeorge spoke to him when he arrived and that he told Officer Littlegeorge where Defendant said he was coming from and where he sat down. (TR. 31.) Officer StCyr testified he

3

left when Officer Littlegeorge started speaking to Defendant.  (TR. 31.)  Officer StCyr stated that he never told Defendant he was under arrest.  (TR. 33.)   Officer StCyr testified he did not give Defendant a *Miranda* advisement.  (TR. 34.)

Officer Littlegeorge testified that as Officer StCyr made contact with Defendant, he began talking to Annette Levering ("Annette"), who is Defendant's mother.  (TR. 10-11.)  Officer Littlegeorge testified that Annette was complaining of pain in her thigh and buttocks area.  (TR. 10.)  Officer Littlegeorge testified that he noticed Annette had scratches on her arm and marks on the right side of her neck.  (TR. 10.)  Officer Littlegeorge testified that he asked Annette if she wanted medical attention and that Anette responded she did not.  (TR. 10.)  Officer Littlegeorge testified that Annette agreed to speak to a community health representative ("CHR") and so he advised dispatch.  (TR. 10.) Officer Littlegeorge testified that Annette began telling him about a cell phone that Defendant had taken and thrown.  (TR. 10).  Annette told Officer Littlegeorge that the phone was on the hill somewhere, so he walked down the hill a little way to look for it.  (TR. 10.)  After looking for a bit, they found a flip phone that Annette said was hers.  (TR. 111.)

Officer Littlegeorge testified that he then escorted Annette back to the house where he spoke to Rave.  (TR. 11.)  Rave told Officer Littlegeorge that she was fine.  (TR. 11.)  Rave told Officer Littlegeorge that she did not want Defendant to go to jail or anything to happen to him.  (TR. 11.)  Officer Littlegeorge testified that he then asked Rave if she was okay again and she responded that she got kicked but was fine.  (TR. 11.)

Officer Littlegeorge testified that through his conversations with Annette and Rave, he learned Defendant had committed the assault.  (TR. 11.)  Officer Littlegeorge testified that he is familiar with Defendant because they went to high school together.  (TR. 11.)  After speaking to Annette and Rave, Officer Littlegeorge got in his patrol car and drove around the back of the house and down the hill to Officer StCyr.  (TR. 11-12.)  Officer Littlegeorge testified that Officer StCyr was located approximately 200-300 yards away.  (TR. 12.)

Officer Littlegeorge testified that when he arrived at Officer StCyr's location, he observed Officer StCyr standing up and Defendant sitting on the curb.  (TR. 12.)  Officer Littlegeorge testified Officer StCyr and Defendant were speaking to each other.  (TR. 12.)  Officer Littlegeorge

4

testified that when he arrived, Officer StCyr started talking to him and then Defendant started talking to him. (TR. 12.) He asked Defendant what was going on and Defendant began telling him what happened and explained that his sister was flipping out. (TR. 12.) Officer Littlegeorge testified Defendant was not free to leave at that point because he was questioning him and wanted to get everyone's statements. (TR. 21-22.)

Officer Littlegeorge testified that Defendant began questioning him about what Annette told him and Officer Littlegeorge told Defendant what Annette said. (TR. 12.) Officer Littlegeorge testified that Defendant told him that he never touched Annette. (TR. 12.) Officer Littlegeorge testified that he told Defendant what the accusations were and that they had a back-and-forth conversation. (TR. 12.) Officer Littlegeorge stated Defendant denied doing anything and explained his side of the story. (TR. 12.) At that point, Defendant told him that he had been in prison and had come back to live with Annette when the dispute broke out. (TR. 12.) Officer Littlegeorge testified that Defendant told him he did not want to go back to prison. (TR. 12.) Officer Littlegeorge testified that once he learned Defendant had been in prison, he asked Officer StCyr to call dispatch and Officer StCyr told him Defendant was on federal probation. (TR. 14.)

Officer Littlegeorge testified that his conversation with Defendant was calm and took place outdoors while Defendant was seated on the curb of a public street. (TR. 13.) Officer Littlegeorge testified that Officer StCyr and he were wearing uniforms, but neither of them pulled out a firearm. (TR. 13-14; TR. 32.) Officer Littlegeorge testified that his firearm was visible. (TR. 16.) Defendant was not handcuffed during the conversation. (TR. 14.)

Officer Littlegeorge testified that after he spoke to Defendant, he decided he was going to arrest him. (TR. 23.) Officer Littlegeorge advised Defendant he was going to be placed under arrest. (TR. 13.) Officer Littlegeorge testified that Defendant was upset when he was told he was under arrest but did not yell. (TR. 15.) Officer Littlegeorge testified that Defendant said "F-it take me to jail." (TR. 15.) Officer Littlegeorge testified that Defendant was placed under arrest after giving his side of the story and shortly after he learned Defendant was on federal probation and Defendant had taken the preliminary breath test with a reading of .202. (TR. 13.) Officer Littlegeorge testified that he placed Defendant in handcuffs, put him in the back of his patrol car, and transported him to the station. (TR. 14.) Officer Littlegeorge then contacted Defendant's

probation officer and transported Defendant to jail. (TR. 14.) Officer Littlegeorge stated that once Defendant was handcuffed and placed in the patrol vehicle, he did not interview Defendant any further. (TR. 15.) Officer Littlegeorge testified that once he took Defendant to jail, he was no longer involved. (TR. 15.) Officer Littlegeorge stated that he never provided Defendant a *Miranda* advisement. (TR. 16.)

## DISCUSSION

Defendant requests that all evidence obtained as a result of his encounter with law enforcement on September 16, 2020 be suppressed. Defendant maintains his Fifth Amendment rights were violated because he was not read his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) before being questioned by Officer StCyr and Officer Littlegeorge. The government maintains that because the incident involves a Native American defendant and the actions of tribal law enforcement within the boundaries of a Native American reservation, the Fifth Amendment and *Miranda* do not apply. *See United States v. Lester*, 647 F.2d 869, 872 (8th Cir. 1981) (noting that "the Bill of Rights is not applicable to Indians on Indian land"). The government contends that although the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1302(a)(4), creates a similar protection against being compelled to self-incriminate as the one contained within the Fifth Amendment, the ICRA is not coextensive with the Bill of Rights. The government acknowledges, however, that the Winnebago Police Department regularly utilizes *Miranda* warnings prior to custodial interviews of suspects. (Filing No. 19 at CM/ECF p. 3.)

For purposes of this Findings and Recommendation, the undersigned will assume that *Miranda* is applicable. Even making this assumption, however, Defendant's argument that his Fifth Amendment rights were violated is unpersuasive. Law enforcement may briefly detain a person and question them as part of a *Terry* stop investigation without advising the subject of his *Miranda* rights. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). *Miranda* warnings are required, however, when a person is interrogated by law enforcement after being taken into custody. *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quotation omitted). "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.

"To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." Huether, 673 F.3d at 794 (quotation omitted). "The inquiry is an objective one, without consideration of the participants' subjective views." Id. An officer's "unarticulated plan has no bearing on the question of whether a suspect is in custody at a particular time; the one relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 442. Courts have found the following non-exhaustive factors relevant to the custody inquiry: (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or (6) whether the suspect was placed under arrest at the end of questioning. Huether, 673 F.3d at 794.

Other relevant factors to be considered in determining custody include the "purpose, place and length of the interrogation." United States v. Griffin, 922 F.2d 1343, 1348 (8th Cir. 1990). However, [i]t is insufficient to render an interrogation custodial that the purpose of the interrogation is to obtain potentially inculpatory information from a suspect that has become the focus of the investigation." Id. "Although custody is not inferred from the mere circumstance that the police are questioning the one whom they believe to be guilty, the fact that the individual has become the focus of the investigation is relevant to the extent that the suspect is aware of the evidence against him and this awareness contributes to the suspect's sense of custody." Id. (internal quotation omitted). Still, "the fact that the purpose of the questioning is to further focus the investigation on the defendant does not weigh heavily in the analysis." Id.

Considering the totality of the circumstances, Defendant was not in custody when he spoke to Officer StCyr and Officer Littlegeorge. Defendant was walking down a public road when he encountered Officer StCyr. The encounter was brief and occurred outdoors on a public road. The officers did not activate their emergency lights or sirens when they were dispatched to the residence or as they approached Defendant on the road. As Officer StCyr exited his patrol car, Defendant voluntarily acquiesced to questioning by approaching the officer and sitting down on the ground without being instructed to do so. Defendant was not handcuffed and possessed

7

unrestrained freedom of movement until he was arrested. The officers testified Defendant was not free to leave, but the record does not show Defendant was informed he was not free to leave until he was placed under arrest.

Moreover, the officers did not use strong-arm tactics to get Defendant to answer questions. Although the officers were in uniform and possessed firearms, they did not brandish their weapons at any point. Defendant voluntarily and willingly explained to officers what had occurred and asked questions about what the other parties had reported to the officers. Officer Littlegeorge described his conversation with Defendant as back-and-forth. When Officer Littlegeorge concluded his brief investigation, he decided to place Defendant under arrest. Officer Littlegeorge then told Defendant he was going to be placed under arrest, and Defendant responded, "F-it take me to jail." This response indicates Defendant did not think he was in custody or under arrest prior to being told he was going to be arrested. The record shows a reasonable person in Defendant's position would not have considered himself in custody for purposes of *Miranda* at the time he was questioned by officers.[1]

Further, any argument that Defendant's statements to the officers were involuntary is without merit. "Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by their maker. A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (internal quotations and citations omitted). "The appropriate test for determining whether a statement or confession is voluntary is whether the alleged statement or confession was extracted by threats, violence, or direct or indirect promises, such that [an individual's] will is overborne and his . . . capacity for self-determination critically impaired." *United States v. Gipp*, 147 F.3d 680, 683 (8th Cir. 1998) (internal quotation omitted). In deciding whether a suspect's statements were made voluntarily, courts consider the totality of the circumstances. *United States v. Estey*, 595 F.3d 836, 839 (8th Cir. 2010).

The totality of the circumstances show that Defendant did not make any involuntary statements. The officers did not extract any information from Defendant by threats, violence, or

---

[1] It does not appear that Defendant contends he was subjected to an interview after his arrest. The Court is unaware of any incriminating statements made by Defendant to officers after his arrest.

promises. Officer StCyr testified that when he first approached Defendant, he asked where he was coming from and then just let Defendant talk. Defendant then proceeded to tell Officer StCyr that he had been sleeping and his mom came into his room and started hitting him and asking for money. Officer SyCyr testified that at that point, Defendant was just providing him information. A few minutes later, Defendant engaged in a back-and-forth conversation with Officer Littlegeorge at which time he asked Officer Littlegeorge what Annette had said and told Officer Littlegeorge his side of the story. The officers were in uniform and had firearms, but they did not brandish their weapons. Although Defendant was intoxicated, he was able to communicate what happened at the residence and was able to ask questions regarding the other parties' description of events. He also understood when Officer Littlegeorge told him he was going to be arrested. Defendant remained calm after learning this news and did not attempt to resist arrest. There is no indication that Defendant's will was overborne or his capacity for self-determination was critically impaired. Therefore, the undersigned concludes Defendant's constitutional rights were not violated and will recommend that Defendant's Motion to Suppress be denied.

Accordingly.

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress ([Filing No. 16](#)) be denied.

Dated this 23rd day of December, 2020.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.